**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JESSICA HANKEY, ADMINISTRATRIX OF THE ESTATE OF RYAN ROHRBAUGH, | |
| Plaintiff, | NO. 3:05-CV-0136 |
| v. | (JUDGE CAPUTO) |
| YORK COUNTY PRISON, et al., | |
| Defendants. | |

## <u>MEMORANDUM</u>

Presently before the Court are several motions for summary judgment by the defendants in this action, including the Motion for Summary Judgment of Defendant Dr. Alan Esper (Doc. 229); the Motion for Summary Judgment of Defendants Prison Health Services, Inc. ("PHS") and Dr. Mark Baker (Doc. 234); and the Motion for Summary Judgment of Defendants Wexford Health Sources, Inc. ("Wexford") and Physician's Assistant Debra O'Leary (Doc. 237). Plaintiff Jessica Hankey, Administratrix of the Estate of Ryan Rohrbaugh, voluntarily withdraws several claims which are the subject of motions for summary judgment. The Court will dismiss the withdrawn claims. As to the remaining claims, the Court will deny the Motion for Summary Judgment of Defendant Dr. Esper and that of Defendants Wexford and P.A. O'Leary. The Court will grant in part and deny in part the Motion for Summary Judgment of Defendants PHS and Dr. Baker.

This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 ("federal question jurisdiction") and over her state law claims pursuant to 28 U.S.C. § 1367(a) ("supplemental jurisdiction").

## BACKGROUND

Ryan Rohrbaugh, deceased, brought claims against Defendants under 42 U.S.C. § 1983 and Pennsylvania medical malpractice law. Rohrbaugh was incarcerated as the result of a parole violation from January to December of 2003. During his incarceration, he was diagnosed with melanoma, from which he ultimately died after his release from prison. After his death on June 7, 2006, Jessica Hankey, individually and as Administratrix of Rohrbaugh's estate, was substituted as Plaintiff. (Doc. 166.)

Rohrbaugh was first incarcerated for a parole violation at York County Prison on January 4, 2003. (PHS/Baker Statement of Facts ¶ 3, Doc. 236)[1] (hereinafter "PHS Statement"). At the time of his incarceration there, PHS was the third party health care provider at York County Prison. (*Id*. ¶ 1.) On May 8, 2003, Rohrbaugh was transferred to the State Correctional Institution-Camp Hill ("SCI-Camp Hill"). (*Id*. ¶ 5.) During his time at SCI-Camp Hill, Wexford was the third party health care provider at the prison. (Wexford/O'Leary Statement of Facts ¶ 8, Doc. 238) (hereinafter "Wexford Statement").

On May 13, 2003, P.A. O'Leary performed a routine physical examination of Rohrbaugh as part of his intake at SCI-Camp Hill. During the exam, she reviewed the results of blood and urine tests that had been performed upon his arrival at the prison. She noted that certain results from the tests were outside normal parameters. On June 12, 2003, she ordered the tests re-performed. The new tests came back within normal parameters. (*Id*. ¶¶ 22-29.) Also during the May 13 intake examination, P.A. O'Leary noted that Rohrbaugh

---

[1] The Court refers to the Defendants' Statements of Material Facts to which they contend there is no dispute, submitted pursuant to Local Rule 56.1, only where facts are admitted by Plaintiff.

had a mole on his back that appeared abnormal in the sense that it was "raised," "irritated," and "pigmented." (*Id*. ¶ 30.) Rohrbaugh testified at deposition that P.A. O'Leary advised him to sign up for "sick call" to have the mole removed. (Rohrbaugh Dep. at 80, Aug. 22, 2005, Ex. 2, Doc. 239.) There is uncertainty in the record as to whether Rohrbaugh ever sought further medical treatment at SCI-Camp Hill. Wexford and P.A. O'Leary assert that prison medical records reveal that decedent never sought any treatment at the prison. (Wexford Statement ¶ 36.) Rohrbaugh testified that he did sign up for sick call and was seen by a nurse as well as a doctor prior to leaving the prison. (Rohrbaugh Dep. at 83-84, Aug. 22, 2005, Ex. 2, Doc. 239.) It is undisputed, however, that no further medical steps were taken regarding his mole at SCI-Camp Hill.

Rohrbaugh was transferred to the State Correctional Institution-Albion ("SCI-Albion") on August 4, 2003. (PHS Statement ¶ 8.) As of August 30, 2003, PHS was the third party health care provider at the prison. (*Id*. ¶ 9.) On September 4, Rohrbaugh was seen by a physician's assistant regarding a painful mole. A biopsy was scheduled for September 8, but Rohrbaugh did not come to the appointment. He received the re-scheduled biopsy on September 27. The prison medical department received the results on October 6, which revealed the presence of malignant melanoma. Dr. Esper, a general surgeon not employed by the prison, was consulted to see Rohrbaugh at the on-site general surgery clinic. Dr. Esper evaluated him on October 15, and recommended he undergo a wide excision of the melanoma. Dr. Esper performed the excision at an area hospital on November 4. *(Id. ¶¶15-26.)* On November 6, the pathological impression of the excision was, according to prison records:

    1)     Superficial spreading malignant melanoma. Clark's level V, 6 mm

thick with mild lymphohistiocytic inflammatory infiltrate;

2)       All surgical margins of excision negative for malignant neoplasm;

3)       Cicatrix

(*Id*. ¶ 27.)

Dr. Esper saw Rohrbaugh again on November 19, 2003. At that time, Dr. Baker, medical director of SCI-Albion, spoke to both Dr. Esper and Rohrbaugh about referring the latter to a medical oncologist. (*Id*. ¶¶ 28, 29.) According to Dr. Baker's deposition testimony and progress notes, Dr. Esper recommended a consultation with an oncologist, but Rohrbaugh, who understood he was soon to be released, preferred to seek follow-up treatment after leaving prison. (Baker Dep. at 36-40, Jan. 18, 2008, Ex. H, Doc. 236.) Also according to Dr. Baker's testimony and progress notes, he met with Rohrbaugh again on December 5—after confirming with his parole officer Rohrbaugh's anticipated release within two (2) to eight (8) weeks—to advise him to seek further treatment after release and to give him a copy of his pathology report of November 6, a letter from Dr. Esper regarding the surgery, and a prescription for a possible follow-up metastatic work-up. (*Id*. at 54-55.)

Rohrbaugh was released from prison on December 22, 2003. He sought care related to his melanoma approximately seven (7) weeks after his release. He later had a recurrence of the cancer and was ultimately diagnosed with metastatic disease, from which he died on June 7, 2006. (PHS Statement ¶¶ 36, 37, 39, 40.)

Rohrbaugh filed the present action on January 19, 2005. (Doc. 1.) An amended complaint was later filed with leave of the Court on September 6, 2005. (Docs. 112, 113.) A number of defendants named in the amended complaint have been voluntarily dismissed since that time. (Docs. 213, 214, 216, 227.) Though the amended complaint re-states

claims raised in the original complaint against SCI-Camp Hill and SCI-Albion, the Court previously held that the prisons enjoy immunity under the Eleventh Amendment to the U.S. Constitution and are not properly named defendants in this action. (Doc. 73.) In accordance with this ruling, Rohrbaugh omitted the two (2) prisons from the caption of his amended complaint. (Doc. 113.) The Court presumes, therefore, that the amended complaint's claims against SCI-Camp Hill and SCI-Albion were included in error.

The remaining Defendants are Wexford, P.A. O'Leary, Dr. Baker, Dr. Esper, and PHS. Defendants Wexford, P.A. O'Leary, Dr. Baker, and PHS filed answers to the amended complaint with affirmative defenses and cross-claims. (Docs. 116, 118.) Dr. Esper filed a motion to dismiss (Doc. 124) which was granted in part and denied in part (Doc. 131). He then filed an answer with affirmative defenses and a cross-claim. (Doc. 134.)

Plaintiff's amended complaint raises a medical malpractice claim against each remaining Defendant[2] as well as a § 1983 claim for violation of the Eighth Amendment to the U.S. Constitution against each, with the exception of Dr. Esper. (Doc. 113.) There are three motions for summary judgment pending before the Court. Dr. Esper moves for summary judgment as to the medical malpractice claim against him. (Doc. 229.) Defendants PHS and Baker together move for summary judgment as to the medical malpractice and § 1983 claims against them. (Doc. 234.) Defendants Wexford and P.A. O'Leary together move for summary judgment as to the medical malpractice and § 1983 claims against them. (Doc.

---

[2]      The medical malpractice claims against the corporate defendants are based on a theory of vicarious liability.

5

237.) These motions are fully briefed[3] and ripe for disposition.

## LEGAL STANDARD

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law.

---

[3]     Local Rule 56.1 of the U.S. District Court for the Middle District of Pennsylvania provides that:

> A motion for summary judgment filed pursuant to Fed.R.Civ.P.56, shall be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried. The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required in the foregoing paragraph, as to which it is contended that there exists a genuine issue to be tried.  Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements.

M.D. Pa. Local R. 56.1.  The Court notes that Plaintiff has filed a counter-statement responding to the statement of facts submitted by Defendants in support of each motion for summary judgment.  However, Plaintiff's counter-statements are not fully compliant with the Local Rule.  Her counter-statement in response to Dr. Esper's statement of facts is not filed as a separate document.  (*See* Doc. 242.)  In addition, many of the statements of fact contained in each of Plaintiff's counter-statements are not supported by references to the record.  (*See* Docs. 242, 243, 246.)  The Court admonishes counsel to comply with the Local Rules in the future and will not consider any unsupported statements of fact contained in Plaintiff's counter-statements in its analysis.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Id.* An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id*.

Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See* Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2D § 2727 (2d ed. 1983). The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the Court that "the nonmoving party has failed to make a sufficient showing of an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). Once the moving party has satisfied its initial burden, the burden shifts to the nonmoving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256-57.

The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## DISCUSSION

### I. <u>Medical Malpractice Claims</u>

#### A. <u>Law</u>

"In order to establish a prima facie case of malpractice, the plaintiff must establish (1) a duty owed by the physician to the patient (2) a breach of duty from the physician to the patient (3) that the breach of duty was the proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient, and (4) damages suffered by the patient that were a direct result of that harm." *Mitzelfelt v. Kamrin*, 584 A.2d 888, 891 (Pa. 1990). "A plaintiff is also required to present an expert witness who will testify, to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered." *Id*. at 892.

In cases where, irrespective of the quality of the medical treatment, a certain percentage of patients will suffer harm (cancer being the classic example), the proximate cause standard is somewhat relaxed. In such cases,

> Once there is sufficient testimony to establish that (1) the physician failed to exercise reasonable care, that (2) such failure increased the risk of physical harm to the plaintiff, and (3) such harm did in fact occur, then it is a question properly left to the jury to decide whether the acts or omissions were the proximate cause of the injury.

*Id.* at 894-95. It is the jury's duty to "balance probabilities and decide whether defendant's negligence was a substantial factor in bringing about the harm." *Hamil v. Bashline*, 392 A.2d 1280, 1286 (Pa. 1978). All parties agree that the *Mitzelfelt/Bashline* proximate cause standard applies in this case.

      B.      Defendants Wexford Health Services and Physician's Assistant O'Leary

Wexford was the third party health care provider at SCI-Camp Hill during Rohrbaugh's incarceration. P.A. O'Leary was employed by Wexford and performed a physical examination of Rohrbaugh as part of his intake at the prison. Defendants argue that they are entitled to summary judgment because Plaintiff cannot establish the element of causation.

To meet her expert testimony requirement, Plaintiff offers the opinion of Physician's Assistant Raymond P. Mooney as to the standard of care and the opinion of Dr. Douglas Fraker as to causation.

Defendants' brief recognizes that there exists uncertainty in the record as to what, if any, medical attention Rohrbaugh received at SCI-Camp Hill after his physical examination by P.A. O'Leary. (Wexford/O'Leary Br. in Supp. of Mot. at 9-10, Doc. 240.) Defendants assert that P.A. O'Leary advised Rohrbaugh to seek medical attention by signing up for "sick call" to have the mole excised, but contend prison medical records show that he never sought such care. (Wexford Statement ¶¶ 33, 36.) They also recognize Rohrbaugh testified that he signed up for sick call and was soon seen by a nurse and later a doctor regarding his mole. (*Id.* ¶¶ 38, 39.) Defendants argue that Plaintiff cannot establish causation under either version of events.

Defendants cite Dr. Fraker's deposition testimony for the proposition that, according to his expert opinion, the causal connection between Rohrbaugh's lack of care at SCI-Camp Hill and his ultimate death is a delay in receiving a biopsy.[4]  They first argue that, if Rohrbaugh never sought medical care at the prison, the causal delay in getting a biopsy is attributable to the decedent and Plaintiff cannot establish causation as to Defendants.

This argument fails to take into account that Plaintiff alleges a failure of care in Rohrbaugh's initial screening and examination.  P.A. Mooney, the sole expert offered on the standard of care required of Wexford employees at SCI-Camp Hill, opines first as to the conduct of Physician's Assistant Philip Richardson, who saw Rohrbaugh for a few minutes at the completion of his "Initial Reception Screening" on May 8, 2003.  (Mooney Report at 2, Ex. E, Doc. 247.)  P.A. Mooney opines that P.A. Richardson breached the standard of care by performing an insufficiently thorough screening.  (*Id*. at 3.)  He also expresses an opinion on the conduct of P.A. O'Leary, who performed a physical examination of Rohrbaugh on May 13, 2003.  He opines that she insufficiently documented the characteristics of the

---

[4]  At Dr. Fraker's deposition, the following colloquy took place:

> Q:  Just so I'm clear, your problem, if you will, your problem there with [the time frame between May 8, 2003 through August 4, 2003] was that Mr. Rohrbaugh did not receive the opportunity to have an excisional biopsy?

> A:  He did not have a diagnostic biopsy of his melanoma, that ultimately caused his demise.

> Q:  That's the only, if you will, problem that you have with that time frame, May 8, 2003 to August 4, 2003.  Correct?

> A:  Correct.

(Fraker Dep. at 107-108, Dec. 10, 2008, Tab 4, Doc. 239.)

suspect mole and infers that she should have ordered a biopsy and/or dermatology consultation.  (*Id*. at 5.)  Finally, he opines that if the required standards had been followed, Rohrbaugh would have received care for the mole at an earlier date.  (*Id*. at 3, 5.)  Viewing the facts in the light most favorable to the non-movant, these breaches at the initial screening and examination stage could have effected a delay in receiving a biopsy, whether or not Rohrbaugh himself sought out care, by failing to catch and address the problem at this initial stage.

Defendants also argue that Plaintiff cannot establish causation under the version of events given by Rohrbaugh because, according to his own testimony, he was offered but declined medical attention for his mole.  He testified in deposition that he signed up for sick call and was seen by a nurse and later a doctor, both of whom indicated he could have the mole removed at SCI-Camp Hill.  (Rohrbaugh Dep. at 80-83, Aug. 22, 2005, Tab 2, Doc. 239.)  He further testified that he decided to wait and seek care at SCI-Albion, where he was soon to be transferred, because the nurse and doctor told him the mole was likely benign and implied there was no harm in waiting.  (*Id.* at 82-84.)  Defendants connect this testimony with that of Dr. Fraker, who stated the following during his deposition:

> Q:     Would you agree with me that if Ryan Rohrbaugh between May 8, 2003 and August 4, 2003 were offered the opportunity to have an excisional biopsy of his mole and he refused, that there would be no causal link between anything that happened between May 2, 2003 and August 4, 2003 and Ryan Rohrbaugh's ultimate demise?

> A:     Yes, I will agree with that, and I'll just restate it.  That the period between February, March of 2003 and into September 2003 was a patient who noted a changing mole, and treatment for that and really the only treatment for that is a biopsy.  And so if a patient is offered or told to have a biopsy and then refuses, then that's the heart of the causal effect and negates the impact.

11

(Fraker Dep. at 112-113, Dec. 10, 2008, Tab 4, Doc. 239.)[5] Defendants argue this concession by Dr. Fraker, combined with Rohrbaugh's independent choice to defer care of his mole, show that Plaintiff cannot establish causation.

Defendants may well demonstrate at trial that subsequent events, such as Rohrbaugh's own decisions, broke the casual chain as to the impact of P.A. Richardson and O'Leary's conduct.[6] However, for present purposes, they have not demonstrated there is no dispute of material fact as to causation. They acknowledge conflict in the record over what care, if any, Rohrbaugh received at SCI-Camp Hill after his intake examination. As discussed above, at least one possible version of events supports Plaintiff's theory of causation. Summary judgment would therefore be inappropriate. Defendants' motion will be denied.

---

[5]   Plaintiff's counsel objected to this line of questioning on the basis that it goes beyond the scope of Dr. Fraker's opinion by inquiring about standard of care rather than causation. Counsel argued at oral argument that, in Dr. Fraker's opinion, the delay in obtaining a biopsy caused Rohrbaugh harm. The party at fault for the delay, he argued, does not impact this opinion. First, the Court disagrees that the nature of defense counsel's questioning goes to the standard of care, which relates to the care required of reasonable medical personnel under the circumstances. Second, counsel's argument is flawed in that, if the causal delay cited by Dr. Fraker is not attributable to Defendants, then his opinion does not provide support for the proposition that a failure in care *by the Defendants* increased the risk of harm to the decedent, and Plaintiff consequently cannot establish causation.

[6]   Plaintiff's counsel noted at oral argument that, according to Rohrbaugh's testimony, he was dissuaded from seeking care at SCI-Camp Hill by the nurse and doctor, presumably employees of Wexford. This point does not impact the Court's analysis. The conduct of other Wexford medical personnel, just as much as that of Rohrbaugh, may break the causal chain of events as to the impact of P.A. Richardson and O'Leary's conduct. The latter are the only two Wexford employees for whom Plaintiff submits evidence of breach of the standard of care.

12

Dr. Esper is the outside general surgeon who performed a wide excision of Rohrbaugh's melanoma during the latter's incarceration at SCI-Albion.  He argues that he is entitled to summary judgment in his favor as to Plaintiff's medical malpractice claim because she cannot establish the element of causation.  He relies on the testimony of Dr. Fraker.  Dr. Fraker rendered an opinion as to Dr. Esper's alleged breach of the standard of care in addition to expressing an opinion on causation as to all Defendants.  Specifically, Dr. Esper argues that Dr. Fraker's report and deposition testimony fail to establish that Dr. Esper's alleged breach of the standard of care was a substantial factor in causing Rohrbaugh's death.

Dr. Fraker's report states that the standard of care required treating Rohrbaugh's melanoma by performing a "re-excision with a 2 cm margin with primary layered closure and sentinel lymph node mapping and biopsy." (Fraker Report at 2, Ex. 3, Doc. 232.)  This is the care Dr. Fraker opines Rohrbaugh should have, but did not receive from Dr. Esper.[7]  Dr. Esper argues that Dr. Fraker's report and testimony fail to provide evidence that this alleged

---

[7]     Plaintiff admits that, at the time of creating his report, Dr. Fraker was not aware Dr. Esper performed a wide excision surgery on Rohrbaugh on November 4, 2003.  (Esper Statement of Facts ¶ 8, Doc. 231; Plaintiff Counter-Statement of Facts ¶ 8, Doc. 242.)  She maintains that Dr. Esper nonetheless fell below the standard of care by failing to perform the precise procedures articulated by Dr. Fraker (namely, a two (2) centimeter re-excision with sentinel node mapping and biopsy).  Plaintiff's counsel explained at oral argument that Dr. Esper's procedure was deficient in failing to use wide enough margins and failing to perform lymph node mapping.  Thus, despite a factual premise incorrect in some respects, Dr. Fraker's expert report still provides record evidence of a failure to provide reasonable care sufficient to meet the first requirement of the *Mitzelfelt* proximate cause test.

breach was a substantial factor in causing Rohrbaugh's death because: (1) it is undisputed that, prior to Dr. Esper's involvement, Rohrbaugh had the most advanced primary lesion possible (*Id.*; Esper Statement of Facts ¶ 6, Doc. 231) (hereinafter "Esper Statement"); (2) it is undisputed that Rohrbaugh had a high statistical probability of death prior to Dr. Esper's involvement (*Id.* ¶ 7; Fraker Dep. at 28:5-18, Dec. 10, 2008, Ex. 4, Doc. 232); (3) Dr. Fraker cannot say with a reasonable degree of medical certainty whether Rohrbaugh had metastatic melanoma prior to Dr. Esper's involvement (*Id.* at 49:2-8.); and (4) an authoritative text in the field shows that the size of the margin used by Dr. Esper in his excision surgery would not effect survivability (*See* Esper Br. in Supp. of Mot. at 8-9, Doc. 230 (citing the National Comprehensive Network Clinical Practice Guidelines in Oncology)).

Plaintiff responds that these perceived deficiencies in Dr. Fraker's opinion are appropriate areas for cross-examination, but do not establish a lack of dispute of material fact. She argues that Dr. Fraker has opined, in both his report and deposition, that Dr. Esper's negligent care increased Rohrbaugh's risk of death. She points first to his expert report, in which he opines that delays in receiving proper care caused Rohrbaugh "significant harm." (Fraker Report at 2, Ex. 3, Doc. 232.) He specifically includes Dr. Esper's failure to perform a two (2) centimeter re-excision surgery and a sentinel node biopsy and mapping among the delays in medical care Rohrbaugh experienced while incarcerated that "may well have been the difference" between a controllable cancer and the widely mestastatic disease from which he died. (*Id.*) Plaintiff also points to deposition testimony by Dr. Fraker in which he specifically opines on decedent's increased risk of harm:

> Q:     But as you sit there today, you can't say to within a reasonable degree
>        of medical certainty whether or not Ryan Rohrbaugh had metastatic
>        melanoma piror [sic] to September of 2003 or after September 2003.

14

You can't say that, can you, doctor?

A:  I cannot say.  I can say that the delay in getting ultimate treatment led
to his increased risk – within a reasonable degree of medical certainty,
increased risk of death from melanoma.  And people – as we already
discussed, because you asked me whether surgical resection of nodes
leads to cure, and I documented that it does.

(Fraker Dep. at 49:2-14, Dec. 10, 2008, Ex. 4, Doc. 232.)

The Court agrees with Plaintiff that she has produced sufficient evidence to withstand summary judgment.  Dr. Fraker opines that the standard of care required certain actions of Dr. Esper that were not taken and that the delay in receiving the proper care contributed to the progression of Rohrbaugh's cancer to a stage that caused his death.  This *prima facie* showing is all that is required under *Mitzelfelt*.  Having made the necessary showing, it is the province of the jury to determine whether Dr. Esper's actions were a substantial factor, and therefore a proximate cause, of Rohrbaugh's ultimate harm.  Dr. Esper's motion for summary judgement will therefore be denied.

D.    Defendants Prison Health Services and Dr. Baker

Plaintiff originally alleged medical malpractice against PHS based on the care received by Rohrbaugh at York County Prison as well as his care at SCI-Albion by Dr. Baker and certain non-party physician's assistants.  Plaintiff voluntarily withdraws her claim against PHS to the extent alleged for care at York County Prison.

Turning to Plaintiff's claims based on Rohrbaugh's care at SCI-Albion, Dr. Baker was the prison's medical director at the relevant time.  He sent Rohrbaugh to see Dr. Esper and also met with decedent after his surgery to discuss continuing treatment.  PHS and Dr. Baker argue that Plaintiff cannot establish the element of causation.  Like Dr. Esper, they argue that Dr. Fraker's testimony fails to connect the alleged breach of the standard of care to the

15

Plaintiff's ultimate harm.

Plaintiff offers the testimony of Dr. Casey Cochran on the standard of care required of Dr. Baker and the testimony of Dr. Fraker on causation. Dr. Cochran opines that Dr. Baker, who has a family practice specialization, breached the standard of care required of a family practitioner by failing to refer Rohrbaugh to a medical oncologist or melanoma specialist for additional care. (Cochran Report at 2, Ex. Q, Doc. 236.) Defendants argue that Dr. Fraker failed to give evidence that this particular failure of care increased Rohrbaugh's risk of harm. Defendants distinguish between the care a patient would receive from a medical oncologist versus a surgical oncologist and argue that Dr. Fraker attributes Rohrbaugh's harm to a delay in receiving the care that a *surgical oncologist* would provide, specifically, a two (2) centimeter-wide excision and sentinel node biopsy and mapping. (*See* Fraker Report, Ex. T, Doc. 236.)

Plaintiff counters that Dr. Fraker's testimony does link the failure to refer Rohrbaugh to a medical oncologist with an increased risk of harm. She points to the following deposition testimony by Dr. Fraker:

> If a medical oncologist – I can certainly speak from my opinion as a melanoma – person who treats melanoma, and knowing our medical oncologists, if Mr. Rohrbaugh or a patient identical to him had been seen after that very limited reexcision [performed by Dr. Esper], they would be referred immediately for additional reexcision and sentinal lymph node mapping and biopsy.

(Fraker Dep. at 116:16-23, Dec. 10, 2008, Ex. U, Doc. 236.) She argues that a reasonable jury could infer from Dr. Fraker's testimony that Rohrbaugh would have received proper treatment sooner if Baker had referred him to a medical oncologist.

The same arguments are repeated with respect to the SCI-Albion physicians assistants. P.A. Mooney opines that the standard of care required the physician's assistants

16

providing care to Rohrbaugh to schedule Rohrbaugh for an oncology consultation. (*See* Mooney Report at 7-10, Ex. S, Doc. 236.) Defendants again argue that Dr. Fraker's testimony fails to provide evidence of an increased risk of harm based on the care a medical oncologist would render. Plaintiff argues that such can be inferred from the above-cited testimony.

The Court agrees with Plaintiff that, based on Dr. Fraker's testimony, a reasonable jury could find that if Rohrbaugh had been referred to a medical oncologist by the SCI-Albion medical staff, he would have received the necessary care sooner. As previously discussed, Dr. Fraker opines that Rohrbaugh would have had a better chance of curing or managing his melanoma had he received a two centimeter excision and sentinel node mapping and biopsy while incarcerated. The cited testimony makes clear that, in Dr. Fraker's opinion, referral to a medical oncologist would have facilitated this end result. Plaintiff has shown enough to survive summary judgment. Defendants' motion will be denied.

## II.    **Section 1983 Eighth Amendment Claims**

### A.    Law

42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

Thus, to prevail on a § 1983 claim, a plaintiff must demonstrate that a state actor deprived her of a federally protected right, privilege, or immunity. *Wilson v. Russo*, 212 F.3d 781, 786 (3d Cir. 2000). Here, Plaintiff alleges that Defendants violated Rohrbaugh's federally

protected rights under the Eighth Amendment to the U.S. Constitution.

The Eighth Amendment's prohibition against cruel and unusual punishment places on prison officials an "obligation to provide medical care for those whom [they are] punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). For Plaintiff to establish an Eighth Amendment violation, she must establish that Dr. Baker acted with deliberate indifference to Rohrbaugh's serious medical needs. *Id.* A medical need is "serious" if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth County Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987) (quoting *Pace v. Fauver*, 479 F. Supp. 456, 458 (D.N.J. 1979), *aff'd*, 649 F.2d 860 (3d Cir. 1981)) (internal quotation marks omitted). Deliberate indifference may be manifested by "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104-05. Mere negligence does not violate the Eighth Amendment. *Estelle*, 429 U.S. at 106. Even an act constituting medical malpractice may be insufficient to establish an Eighth Amendment violation. *Id.* "[M]ere disagreement as to the proper medical treatment" is likewise insufficient to establish an Eighth Amendment violation. *Monmouth County Corr. Institutional Inmates*, 834 F.2d at 346 (citing *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)). The U.S. Court of Appeals for the Third Circuit has specifically found deliberate indifference to exist when: (1) a prison official knows of the prisoner's need for treatment but intentionally refuses to provide it; (2) the prison official delays necessary medical treatment for non-medical reasons; or (3) the prison official prevents a prisoner from receiving needed or recommended treatment. *Rouse v. Plaintier*,

182 F.3d 192, 197 (3d Cir. 1999) (citations omitted).

B.   Withdrawn Claims

Plaintiff voluntarily withdraws her § 1983 claims against PHS, Wexford, and P.A. O'Leary.  The only remaining Eighth Amendment claim lies against Dr. Baker.

C.   Defendant Dr. Baker

Defendants PHS and Dr. Baker argue that there exists substantial documentation of the latter's care of Rohrbaugh on the record.  In particular, Defendants emphasize Dr. Baker's deposition testimony stating that he spoke to Rohrbaugh after his excision surgery about referral to a medical oncologist, but that Rohrbaugh was adamant he did not wish to pursue care until after his release from prison.  (Baker Dep. at 36-37, 40:15-20, Jan. 18, 2008, Ex. C, Doc. 244.)  Dr. Baker further testified that he followed up with prison officials to confirm decedent would soon be released and was informed by his parole officer that his release was anticipated within two (2) to eight (8) weeks.  (*Id*. at 54-55.)  He testified he again met with Rohrbaugh before his release to stress the importance of getting follow-up care and to give him a copy of a letter from Dr. Esper and a prescription for a possible metastatic work-up.  (*Id*. at 54-55, 58-59.)  Based on the existing record, Defendants argue Plaintiff cannot show conduct by Dr. Baker that constitutes deliberate indifference.

Plaintiff argues that Dr. Baker's deposition testimony alone provides sufficient evidence to support her claim for summary judgment purposes.  First, she points to testimony to show that he was aware of Rohrbaugh's serious medical needs.  After Rohrbaugh's November 4, 2003 surgery by Dr. Esper, Dr. Baker testified he met with decedent and advised him to get timely follow-up care with an oncologist "because we know

malignant melanoma can be deadly." (*Id.* at 58:19-22.) Plaintiff argues that, despite his awareness of Rohrbaugh's serious medical need, Baker failed to order a consultation with an oncologist, though he admits he could have ordered the consult. (*Id.* at 40:9-13.) Instead, he advised decedent to see an oncologist after his release from prison. Plaintiff also argues that Dr. Baker should have referred Rohrbaugh to an oncologist instead of a general surgeon in September 2003, when a biopsy first revealed a malignant melanoma. Plaintiff does not contradict Dr. Baker's testimony that he advised Rohrbaugh to see an oncologist, but that decedent did not wish to pursue treatment until after his release from prison.

The Court agrees with Defendants that Plaintiff cannot establish Dr. Baker was deliberately indifferent to Rohrbaugh's serious medical need based on his failure to order an oncology consultation after decedent's surgery, but before his release from prison. Dr. Baker's testimony reveals that he was aware of Rohrbaugh's serious medical need in that he knew a consultation with an oncologist was a necessary next step in the continuing care of his cancer. However, the testimony does not reveal that he was aware such a consultation was necessary prior to his imminent release from prison.[8] Based on Dr. Baker's

---

[8]     The following colloquy took place during Dr. Baker's deposition:

> Q:    Okay. Did you feel an oncology consult was necessary?
>
> A:    I felt an oncology consult was necessary at some point. But the key is the patient was adamant about getting out and wanting to follow up with his own doctors. And that's his own choice.
>
>       ...
>
> Q:    What do you mean when you use the phrase "at some

testimony, Plaintiff cannot demonstrate any of the three instances in which the Third Circuit Court of Appeals has found deliberate indifference. *See Rouse*, 182 F.3d at 197 (deliberate indifference exists where (1) a prison official knows of the prisoner's need for treatment but intentionally refuses to provide it; (2) the prison official delays necessary medical treatment for non-medical reasons; or (3) the prison official prevents a prisoner from receiving needed or recommended treatment). First, Dr. Baker did not intentionally refuse to order an oncology consultation, but deferred to Rohrbaugh's wish to wait until his release to seek care. Second, Dr. Baker delayed Rohrbaugh's immediate treatment for non-medical reasons, namely, Rohrbaugh's desire to await release. However, nothing in Dr. Baker's testimony demonstrates that an oncology consultation prior to Rohrbaugh approaching release was *necessary*. Rather, Dr. Baker expressed the opinion that it could reasonably be delayed for two (2) months. (*See* Baker Dep. at 41-42, Jan. 18, 2008, Ex. C, Doc. 244.) Finally, Plaintiff does not argue that Dr. Baker prevented Rohrbaugh from receiving treatment.

---

point"?

A: Well, again, with the – with his diagnosis, I would think that sooner than later would be better, obviously. But since he was – the dates were coming up, he was insistent upon him leaving within four to six weeks, eight, that it should be done soon.

Q: Did you believe that the oncology conduct should be done sooner than four to six weeks?

A: No, that – that would be a reasonable amount of time to get someone in to an oncologist ... I would recommend within the 60-day time frame, yes.

(Baker Dep. at 41-42, Jan. 18, 2008, Ex. C, Doc. 244.)

Plaintiff also cannot establish deliberate indifference based on Dr. Baker's referring decedent to a general surgeon instead of an oncologist in September 2003. This choice does not reveal an intentional denial of or delay in necessary medical care. Mere disagreement as to the propriety of the chosen care does not give rise to an Eighth Amendment violation. *Lanzaro*, 834 F.2d at 346.

Based on the foregoing, the Court will grant Defendants PHS and Dr. Baker's motion for summary judgment as to Plaintiff's § 1983 against Dr. Baker.

## III.    Supplemental Jurisdiction

In his briefs, Dr. Esper moves the Court to "remand or transfer" the remaining state law claims to state court in the event that all remaining § 1983 claims are dismissed. Plaintiff has withdrawn her § 1983 claims against all remaining Defendants except for Dr. Baker, and as discussed above, the Court will grant summary judgment as to the Eighth Amendment claim against Dr. Baker. However, this Court does not have the power to transfer venue to a state court or remand a case that has not been removed to this court from state court. *See McLaughlin v. Arco Polymers, Inc.*, 721 F.2d 426, 428-29 (3d Cir. 1983). The Court interprets Dr. Esper's motion as a request to decline the further exercise of supplemental jurisdiction over the remaining state law claims in the absence of any remaining federal claims.

This Court has previously held it has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367. (Doc. 131.) A federal district court has the power to exercise supplemental jurisdiction even where the underlying federal claims have been dismissed. *Palmer v. Hospital Auth.*, 22 F.3d 1559, 1568 (11th Cir. 1994).

22

However, § 1367(c)(3) gives a court *discretion* to decline jurisdiction in such circumstances. 28 U.S.C. § 1367(c)(3). In deciding whether to exercise its discretion to decline jurisdiction, a court should consider factors such as judicial economy, convenience, and fairness to the parties. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (U.S. 1966).

Here, the factors weigh in favor of retaining jurisdiction. This case has been in this Court for a number of years; extensive discovery has been conducted; and it is currently scheduled to go to trial in September of this year. Judicial economy would not be served by asking the litigants to start this process anew in state court. Moreover, declining jurisdiction would prove extremely unfair to Plaintiff. First, Pennsylvania's two (2) year statute of limitations for a medical malpractice claim, 42 Pa. Cons. Stat. § 5524(2), has almost certainly expired. Second, Pennsylvania law requires that "a medical professional liability action may be brought against the healthcare provider for a medical professional liability claim only in a county in which the cause of action arose." Pa. R. Civ. P. 1006(a.1). Dr. Esper notes that the claims against himself, Dr. Baker, and PHS all arose in Erie County, Pennsylvania. Conspicuously absent from this list are Wexford and O'Leary. The mandatory venue for Plaintiff's medical malpractice claims against these defendants would presumably be Cumberland County, Pennsylvania, where SCI-Camp Hill is located. Thus, Plaintiff would likely be forced to litigate her malpractice claims in two (2) state venues, rather than a single federal venue.

Considering these factors, the Court will not exercise its discretion to decline supplemental jurisdiction over Plaintiff's state law medical malpractice claims.

**CONCLUSION**

The Court will dismiss those claims voluntarily withdrawn by Plaintiff, including her claims under 42 U.S.C. § 1983 against PHS, Wexford, and P.A. O'Leary, as well as her Pennsylvania medical malpractice claim against PHS to the extent alleged for care provided to the decedent at York County Prison. With regard to the remaining claims, the Court will deny the Motion for Summary Judgment of Dr. Esper (Doc. 229) as well as that of Wexford and P.A. O'Leary (Doc. 237). The Court will grant in part and deny in part the Motion for Summary Judgment of PHS and Dr. Baker. The Court will deny the motion as to Plaintiff's Pennsylvania medical malpractice claims, but grant the motion as to her § 1983 claim.

An appropriate Order follows.


July 8, 2009                                    /s/ A. Richard Caputo
Date                                            A. Richard Caputo
                                                United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

JESSICA HANKEY, ADMINISTRATRIX
OF THE ESTATE OF RYAN
ROHRBAUGH,

       Plaintiff,

        v.

YORK COUNTY PRISON, et al.,

       Defendants.

NO. 3:05-CV-0136

(JUDGE CAPUTO)

**ORDER**

**NOW**, this  <u>8th</u>  day of July, 2009, **IT IS HEREBY ORDERED** that:

(1)    Plaintiff's claims pursuant to 42 U.S.C. § 1983 against Defendants Prison Health Services, Inc., Debra O'Leary, and Wexford Health Sources, Inc. are **DISMISSED.**

(2)    Plaintiff's state law medical malpractice claim against Wexford Health Sources, Inc. is **DISMISSED** to the extent it is based on care provided to Ryan Rohrbaugh at York County Prison.

(3)    The Motion for Summary Judgment of Defendants Wexford Health Sources, Inc. and Debra O'Leary (Doc. 237) is **DENIED** as to Plaintiff's remaining claims.

(4)    Defendant Alan Esper's Motion for Summary Judgment (Doc. 229) is **DENIED.**

(5)    The Motion for Summary Judgment of Defendants Prison Health Services, Inc. and Dr. Mark Baker (Doc. 234) is **GRANTED in part** and **DENIED in part** as to Plaintiff's remaining claims as follows:

(A)  Defendants' motion is **GRANTED** as to Plaintiff's claim against Dr. Mark

Baker pursuant to 42 U.S.C. § 1983.

(B)  Defendants' motion is **DENIED** in all other respects.

/s/ A. Richard Caputo
A. Richard Caputo
United States District Judge